# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MERHLE DAVIS and THOMAS YETTER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Merhle Davis and Thomas Yetter ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant Ford Motor Company ("Defendant" or "Ford").

## NATURE OF THE ACTION

1. Model year 2015–2017 Ford Mustang vehicles ("Subject Vehicles") have a dangerous and defective trunk lid wiring harness that causes numerous features, including critical safety equipment, to function intermittently or not at all. The defective wiring harness can and does interfere with the backup camera, trunk release, trunk light, and satellite radio reception, and poses a significant safety risk to drivers and occupants of Subject Vehicles and the public.

2. When owners and lessees of the Subject Vehicles have sought repair of this defect, they are often informed their vehicle requires a costly fix. The repair procedure Ford communicated to its service technicians is dangerous, inadequate, and does not repair the original defective wiring harness. Ford's dealerships and other repair service providers routinely tell

owners of the Subject Vehicles that no problem could be identified with their vehicle, which then continues to malfunction, subjecting owners and lessees to the expenses and safety risks attributable to the defective wiring harness.

3.     Prior to selling the Subject Vehicles, Ford knew that the trunk lid wiring harnesses in the Subject Vehicles are defective, yet it omitted and kept this material fact from Plaintiffs and other Class members.

4.     In December 2018, Ford issued a technical service bulletin ("TSB") informing service technicians of the wiring harness defect and recommending a repair procedure (but not extending additional warranty coverage) for the defective wiring harness. Ford has not recalled the Subject Vehicles, has not successfully remedied the defect, has not made owners of the Subject Vehicles whole, and has not made the Subject Vehicles safe.

5.     The defective wiring harnesses included in the Subject Vehicles purchased or leased by Plaintiffs and the other Class members did not perform as advertised, as promised, and as warranted. As a result of Ford's misconduct, Plaintiffs and the other Class members were each injured on account of receiving Subject Vehicles that were fundamentally different from what they believed they were purchasing, and less valuable than was represented.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

7.      The Court has personal jurisdiction over Defendant and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District. Plaintiffs reside in this District and purchased their Subject Vehicle in this District. Ford has marketed, advertised, sold, and leased Subject Vehicles within this District.

## PARTIES

### Plaintiffs Merhle Davis and Thomas Yetter

8.      Plaintiffs Merhle Davis and Thomas Yetter, spouses, are adult citizens and residents of Bellingham, Massachusetts. Plaintiffs jointly purchased a 2017 Ford Mustang EcoBoost convertible, pre-owned, in or about 2017 from Carmax. At the time of purchase, the Subject Vehicle had approximately 35,000 miles on the odometer. At the time of purchase, Plaintiffs also purchased an extended warranty through Carmax for service of up to 100,000 miles, subject to a $200 deductible.

9.      Ford's website and the warranty manual make no mention of the defect. At the time of purchase, Plaintiffs were not informed by Carmax of the defect, and on information and belief, Ford never informed Carmax that the Subject Vehicles are plagued by the defect.

10.      In early- to mid-2020, the defect manifested, causing Plaintiffs' Subject Vehicle's backup camera and Sirius XM radio to malfunction. The defect causes intermittent backup camera malfunction and failure in Plaintiffs' Subject Vehicle.

11.      Plaintiff Davis first took the Subject Vehicle to a Ford dealership in early 2021 to address the defect. Specifically, he took it to Franklin Ford, an authorized Ford dealership in Franklin, Massachusetts. Upon presentment of the Vehicle, the Ford dealership told them it was just the trunk lid wiring harness that needs to be replaced. The dealership replaced the wire and

the wiring harness but proceeded to replace the backup camera as well. Plaintiffs had to pay a $200 deductible in connection with obtaining an attempted repair.

12.     When Plaintiff Davis picked up Plaintiffs' Vehicle from the dealership, and despite that the dealership attempted a repair, the Ford dealership told him that it could not fix the issue and could not figure out how to resolve the defect.

13.     Plaintiffs continue to experience backup camera failure due to the defective wiring in their Subject Vehicle, causing safety concerns during vehicle operation.

14.     Had Ford disclosed the defect on its website, in its warranty manual, or communicated the defect to resellers prior to Plaintiffs purchasing their Subject Vehicle, Plaintiffs would not have purchased the Vehicle, or would have paid less for the Subject Vehicle. As a result, Plaintiffs received less than what they paid for the Subject Vehicle and did not receive the benefit of their bargain.

**Defendant Ford Motor Company**

15.     Defendant Ford Motor Company is a Delaware limited liability company with its principal place of business in Dearborn, Michigan. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers, distributors, and other agents, the Subject Vehicles in the United States to Plaintiffs and the other class members.

**FACTUAL BACKGROUND**

*The Defective Trunk Lid Wiring Harness*

16.     The Subject Vehicles are equipped with a defective trunk lid wiring harnesses, highlighted in the image below.



17.     The trunk lid wiring harness is composed of several separate wires responsible for transmitting power and data to the backup camera, luggage compartment lamp, luggage compartment lid release, and satellite radio antenna, which are all bundled together in a single wire loom. Due to a defect in materials and workmanship, the metal conductors inside these wires are prone to fatiguing and breaking, resulting in an intermittent or permanent short circuit and the malfunction of the associated component. By nature, this defect becomes increasingly severe over time.

18.     Owners of the Subject Vehicles experience the consequences of this defect and have reported it to NHTSA repeatedly:

- BACKUP CAMERA AND TRUNK BRAKE LIGHT DO NOT WORK DUE TO KNOWN FLAW IN TRUNK WIRING HARNESS DESIGN. WIRES INSIDE THE HARNESS BREAK FROM OPENING AND CLOSING TRUNK DUE TO COMPRESSION. DEALERSHIP HAS REPAIRED ONCE WHILE UNDER WARRANTY BY CHEAPLY REPLACING SECTIONS OF BROKEN WIRE AND CRUDELY WRAPPING THE ENTIRE HARNESS WITH BLACK ELECTRICAL TAPE, HOWEVER MORE WIRES HAVE BROKEN IN NEW LOCATIONS ALONG THE HARNESS. THIS IS A KNOWN DEFECT WITH A TECHNICAL BULLETIN PUBLISHED BY FORD. HOWEVER THE SERVICE DEPARTMENT REFUSED TO ACKNOWLEDGE THAT THIS IS AN ISSUE COMMON WITH 15-17 MUSTANGS. DESPITE CLEARLY EXPLAINING WHAT WAS WRONG, THEY CLAIMED I WOULD HAVE TO PAY $125

DIAGNOSTIC FEE BECAUSE THEY DON'T KNOW IF THE WIRING MIGHT HAVE BEEN CHEWED BY "VARMINTS." (NHTSA ID 11343732)

BACK UP CAMERA REPEATEDLY WORKS INTERMITTENTLY CAUSING ME TO BACK UP INTO A POST, COSTING $1200 IN DAMAGES ELECTRICAL WIRES GOING TO TRUNK LID ARE INCREDIBLY THIN AND FLIMSY. THIS EFFECTS THE BACK UP CAMERA, TRUNK RELEASE, TRUNK LIGHT, ETC.; ALL OF WHICH HAVE FAILED AT ONE TIME OR ANOTHER. REPAIRED WIRING TWICE BUT THEY ARE SO FRAIL, THEY CONTINUE TO SNAP AND CAUSE MALFUNCTION THROUGHOUT THE CAR. (NHTSA ID 11327647).

- THE REARVIEW CAMERA WILL INTERMITTENTLY DISPLAY A BLANK OR DISTORTED IMAGE. WHEN PLACING THE CAR IN REVERSE THE CAMERA WILL INTERMITTENTLY DISPLAY A BLANK SCREEN OR DISTORTED IMAGE WHILE REVERSING THE VEHICLE. THIS REDUCES THE DRIVER'S VIEW OF WHAT IS BEHIND THE VEHICLE, INCREASING THE RISK OF A CRASH. THIS HAPPENS WHEN BOTH STATIONARY AND IN MOTION.

  THIS IS THE SAME ISSUE THAT MY 2020 FORD MUSTANG GT VIN [XXX] HAS JUST RECEIVED A RECALL NOTICE FOR.

  THE CAMERA BEGAN TO FAIL THE SUMMER OF 2020.

  INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR (NHTSA ID 11375846)

- REAR BACK UP CAMERA WORKS INTERMITTENTLY WHEN SHIFTER PLACED IN REVERSE. SOMETIMES IT SHOWS DISTORTED IMAGES AND SOMETIMES IT JUST GOES BLANK WITH A MESSAGE ON THE SCREEN TO CONTACT YOUR FORD DEALER. (NHTSA ID 11362747)

- BACKUP CAMERA FUNCTIONS INTERMITTENTLY. OFTEN SHOWING AN ERROR MESSAGE, OF REARVIEW CAMERA NOT AVAILABLE. (NHTSA ID 11362696)

- BACK UP CAMERA HAS SAME SYMPTOMS AS 2020 FORD MODELS BEING RECALLED.8/4/20

19.     Backup cameras are a critical safety feature in automobiles. Backover crashes have killed hundreds of people each year and injure thousands more.[1] Recognizing the danger posed by backover crashes, in 2008 Congress passed the Cameron Gulbransen Kids Transportation Safety Act, requiring regulators to enact measures requiring the adoption of technology to improve rearview visibility, which was finally embodied in Federal Motor Vehicle Safety Standard number 111. Accordingly, functioning backup cameras are a requirement of baseline vehicle functionality and a minimum level of quality. The defective trunk lid wiring harness causes the backup camera on the Subject Vehicles to malfunction or fail and the defect poses a serious safety hazard.

20.     NHTSA has received complaints alleging the wiring harness defect resulted in vehicle crashes. *See* NHTSA ID 11327647, 11375846, ¶ 18, *supra*.

21.     Compounding the seriousness of the defect, the repair procedure Ford recommended in TSB 18-2362 is not a safe or proper repair. The procedure advises technicians to splice new wire into the defective harness to replace the broken wire and introduces two new solder joints for each wire replaced. Solder joints are inflexible and even more prone to fatigue and breakage than the original defective wiring. The repair does not introduce any additional strain relief or countermeasure. As a result, vehicles repaired in accordance with TSB 18-2362 are highly likely to exhibit the wiring harness defect again, as described by the first two complaints listed in ¶ 18, *supra.*

***Ford Knew the Trunk Lid Wiring Harnesses in the Subject Vehicles Are Defective***

22.     At the same time Ford was selling the Subject Vehicles to Plaintiffs and the car-buying public, Ford was well aware of the problems with Subject Vehicles' trunk lid wiring

---

[1] *See* Nathan Bomey, *Backup cameras now required in new cars in the U.S.,* USA TODAY (May 2, 2018, 3:07 P.M.), https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/.

harnesses, both from the internal validation and testing that Ford performed and from its past experience and expertise designing automotive wiring.

23.     The fact that metal wire has a finite fatigue life and wiring applications involving large deflection (such as the trunk lid wiring harness) require special attention to guarantee function over a large number of load cycles is readily obvious to qualified engineers and is well known to Ford.

24.     Federal regulations require automobile manufacturers to build vehicles that comply with the Federal Motor Vehicle Safety Standards (49 C.F.R. § 571). The existence of these standards necessarily requires Ford to extensively test its vehicles prior to selling them. During the course of this and other quality validation testing conducted by its engineers prior to sale of the Subject Vehicles, Ford became aware of the defective wiring harness.

25.     Ford utilizes mechanical test fixtures designed to replicate approximately ten years of average use of doors, liftgates, and trunk lids. Because Ford tested the trunk lid on the Subject Vehicles for tens of thousands of load cycles before the Subject Vehicles were made available for sale, Ford necessarily discovered, and knew or should have known about the wiring defect before the Subject Vehicles were sold.

26.     Ford was also aware of the defect based upon negative consumer responses and reactions about the Subject Vehicles and from the presentation of the Subject Vehicles to Ford's authorized dealers for repair of the defect, yet it continued to sell and lease the Subject Vehicles with the defect.

27.     To date, Ford has failed to remedy the defect and continued to sell the Subject Vehicles despite its knowledge of the defect.

28.     To date, Ford has not demonstrated that it is capable of providing an adequate repair for the defect, and Plaintiffs and class members do not know whether Defendant is capable of providing a repair for the defect. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiffs and members of the Class. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction enjoining Defendant and its agents, servants, and employees, and all persons acting under, in concert with, or for it from selling the Subject Vehicles without notice that they are subject to the defect, which cannot be repaired, and that this remains the situation.

**CONTINUING CONDUCT—NEED FOR INJUNCTIVE RELIEF**

29.     As of the filing of this Complaint, Defendant's unlawful conduct as alleged herein is continuing, up to and through the present date. Said conduct, including Defendant's failure to disclose and concealment of the defect, its denial of the existence of the defect, and its failure to fix the defect and provide relief to Class members, as alleged herein, will continue, and will inflict further damage on Plaintiffs and Class members, unless and until a court issues an order directing Defendant to cease and desist from said conduct and correct its unlawful conduct.

30.     Accordingly, while monetary damages may be sufficient to compensate Plaintiffs and Class members for past violations, injunctive relief is necessary to stop Defendant's unlawful course of conduct from continuing

**CLASS ALLEGATIONS**

31.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a) (b)(2), and (b)(3) on behalf of a Class defined as follows:

>       All persons and entities in the Commonwealth of Massachusetts that purchased or leased a Subject Vehicle for end use and not for resale.

32.    Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

33.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

34.    **Numerosity**: The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. While the exact number and identities of individual Class members is unknown at this time, such information being in the sole possession of Ford and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that thousands of Class Vehicles have been sold and leased in Massachusetts.

35.    **Existence/Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.    whether Ford engaged in the conduct alleged herein;

b.    whether Ford omitted and misrepresented material facts to purchasers and lessees of Subject Vehicles;

c.    whether Ford's omissions and misrepresentations regarding the Subject Vehicles were likely to mislead a reasonable consumer;

d.    whether Ford breached warranties with Plaintiffs and the other Class members when it produced, distributed, and sold the Subject Vehicles;

e.    whether Ford engaged in unfair and deceptive acts or practices in its conduct directed toward Plaintiffs and Class members and whether Ford engaged in such unfair and deceptive conduct willfully or knowingly;

f.    whether Plaintiffs' and other Class members' Subject Vehicles were worth less than as represented as a result of the conduct alleged herein;

g.      whether Plaintiffs and the other Class members have been injured;

h.      whether Plaintiffs and the other Class members have incurred damages and the calculation of class-wide damages; and

i.      whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

36.      Ford engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

37.      **Typicality**: Plaintiffs' claims are typical of the claims of the other Class members because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct described above. As with Plaintiffs, Class members also purchased or leased a Subject Vehicle containing the defect. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and no defense is available to Ford that is unique to Plaintiffs. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class members. Plaintiffs and all Class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Ford's wrongful conduct in selling/leasing and failing to remedy the Subject Vehicles.

38.      **Adequacy**:  Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class they seek to represent and have the resources to do so. Neither Plaintiffs nor their counsel

have any interest adverse or antagonistic to those of the Class.

39.     **Superiority**:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents no significant management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

40.     Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Ford maintains regarding sales and leases of the Subject Vehicles, among other records.

41.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Breach of Implied Warranty of Merchantability
### (On Behalf of Plaintiffs and the Class)

42.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

43.    Defendant is and was at all relevant times a merchant with respect to, and manufactured, distributed, warranted, and sold, the Subject Vehicles.

44.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

45.    Plaintiffs and the other Class members purchased the Subject Vehicles manufactured and sold by Defendant in consumer transactions.

46.    The Subject Vehicles when sold, and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used. The Subject Vehicles left Defendant's possession and control with defective wiring that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiffs and the other Class members used their Subject Vehicles in the normal and ordinary manner for which the Subject Vehicles were manufactured and advertised.

47.    Defendant knew at or before the time of sale to Plaintiffs and Class members that the Subject Vehicles were produced with defective wiring that was unfit for ordinary use, that rendered the Subject Vehicles unfit for their ordinary purposes, and that posed a serious safety threat to drivers, passengers, and the public. This knowledge was based on Defendant's own industry standard internal validation of its vehicles prior to launching a new model, internal testing, knowledge about and familiarity with the wiring included in the Subject Vehicles, history of similar problems with similar wiring in prior models, and complaints by consumers and third parties.

48.    The existence and ubiquity of the defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide.

49.     Despite Plaintiffs' and the other Class members' normal, ordinary, and intended uses, maintenance, and upkeep, the wiring of the Subject Vehicles experienced and continues to experience the defect and premature failure.

50.     Plaintiffs' and other Class members' Subject Vehicles are, and at all times were, not of fair or average quality, nor would they pass without objection.

51.     All conditions precedent have occurred or been performed.

52.     To the extent that notice of breach of warranty is necessary or required, Plaintiffs gave notice to Defendant of its breach of warranty in a July 23, 2021 letter, if not earlier (such as when they took their vehicle to a Ford dealer to fix the problem after they experienced issues related to the defect). Alternatively, this Complaint constitutes notice of the breach.

53.     Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect or cure its breaches of warranty.

54.     Plaintiffs and the other Class members suffered and will suffer diminution in the value of their Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging and obtaining

alternative means of transportation, and other incidental and consequential damages recoverable under the law.

55.     Privity is not required in this case under Massachusetts law because Plaintiffs and the other Class members are consumers who are bringing this action against a manufacturer. Plaintiffs are also intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and the other Class members. Privity is also not required because Plaintiffs' and the other Class members' Subject Vehicles are inherently dangerous due to the aforementioned defects and nonconformities.

**COUNT II**
**Fraudulent Omission**
**(On Behalf of Plaintiffs and the Class)**

56.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

57.     Defendant knew the Subject Vehicles' wiring was defective, would fail, and was not suitable for its intended use, and made the Subject Vehicles susceptible to failures of safety features such as the backup cameras.

58.     Defendant concealed from and failed to disclose to Plaintiffs and Class members the defective nature of the Subject Vehicles' wiring.

59.     Defendant was under a duty to Plaintiffs and Class members to disclose the defective nature of the Subject Vehicles' wiring because:

- Defendant was in a superior position to know the true state of facts about the safety defect of the Subject Vehicles' wiring;

- Defendant made partial, materially less than fully truthful disclosures about the quality of the Subject Vehicles without revealing the defective nature of the wiring;

- Defendant actively concealed the defective nature of the Subject Vehicles' wiring from Plaintiffs and other Class members; and

- Defendant was required, by Massachusetts regulation 940 C.M.R. 5.03(5), to give prompt written notice of the defect to "purchasers or owners of [the Subject Vehicles] who are known to [Ford]." *Id.*

60.     The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Subject Vehicles or pay a lesser price for them. Had Plaintiffs and Class members known about the defective nature of the Subject Vehicles' wiring, they would not have purchased or leased Subject Vehicles, or would have paid less for them.

61.     Defendant concealed or failed to disclose the true nature of the manufacturing defects in the Subject Vehicles' wiring in order to induce Plaintiffs and Class members to act thereon. Plaintiffs and the other Class members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class members' purchase or lease of the defective Subject Vehicles.

62.     Ford could have disclosed information about the defect on its website, in the warranty or vehicle booklet, on the Monroney sticker, or to dealerships and third-party resellers so that these entities could disclose the defect to buyers, but it failed to do so.

63.     Defendant continued to conceal the defective nature of the Subject Vehicles' wiring even after Class members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

64.     As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class members have suffered and will continue to suffer actual damages.

**COUNT III**
**Violation of Massachusetts General Laws Chapter**
**93A (On Behalf of Plaintiffs and the Class)**

65.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

66.     M.G.L., c. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M. G. L. c. 93A, § 2.

67.     Ford, Plaintiffs, and class members are "persons" within the meaning of M. G. L., c. 93A, § 1(a).

68.     Ford engaged in "trade" or "commerce" within the meaning of M. G. L., c. 93A, § 1(b).

69.     In the course of Ford's business, it misrepresented and omitted material facts concerning the defect and the Subject Vehicles, concealed and failed to disclose the defect, failed to fix the defect, and failed to provide any to compensation to Plaintiffs and Class members concerning the defect.

70.     This conduct constitutes unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, in violation of M.G.L., c. 93A, § 2. In addition, Defendant's conduct is in violation of at least the following regulations promulgated by the Massachusetts Attorney General under c. 93A:

     a.   940 C.M.R., § 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

     b.   940 C.M.R., § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a

warranty");

    c.    940 C.M.R., § 3.16(2) (providing that it is a violation of c. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction"); and

    d.    940 C.M.R., § 5.03(5) (providing that it is an unfair or deceptive act or practice for a vehicle manufacturer to fail to give prompt written notice of a vehicle defect "to its distributors, zone offices, dealers, and other representatives" and "the purchasers or owners of such vehicles who are known to the manufacturer.").

71.    Because of Defendant's unfair and deceptive conduct, including, among other things, its concealment and failure to disclose the defect and its failure to fix the defect, Plaintiffs and Class members did not receive what they bargained for, and they overpaid for the Subject Vehicles.

72.    As a direct and proximate result of Defendant's unfair and deceptive conduct in violation of M.G.L., c. 93A, §2, Plaintiffs and the other members of the Class have suffered injury in the following ways: diminution in the value of their Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law. Had they been aware of the defect, Plaintiffs and the other members of the Class either would either have paid less for the Subject Vehicles or they would not have purchased them at all. Accordingly, as a result of Defendant's misconduct, Plaintiffs and the other members of the Class did not receive the benefit of their bargain.

73.    Plaintiffs and the members of the Class also suffered injury in the form of the

additional profits made by Defendant as a result of its acts and omissions with respect to the defect.

74.     Pursuant to M. G. L. c. 93A, § 9, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each violation. Because Defendant's conduct was committed willfully and knowingly, Plaintiffs and Class members are entitled to recover up to three times their actual damages, but no less than two times actual damages.

75.     Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding attorneys' fees, costs, and any other just and proper relief available under M.G.L.,c. 93A.

76.     On July 23, 2021, Plaintiffs sent to Ford a written demand for relief pursuant to M. G. L., c. 93A, § 9(3).

77.     Ford failed to make a reasonable offer of relief in response to the demand.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in favor of Plaintiffs and all others similarly situated and against Defendant as follows:

A.     Certifying the Class under Fed. R. Civ. P. 23 as requested herein;

B.     Appointing Plaintiffs as class representatives and undersigned counsel as class counsel;

C.     Finding that Ford engaged in the unlawful conduct as alleged herein;

D.     Awarding Plaintiffs and the other Class members actual, compensatory, and consequential damages;

E.      Awarding Plaintiffs and the other Class members actual damages or statutory damages, whichever yields a greater recovery and multiple damages where available;

F.      Awarding Plaintiffs and the other Class members declaratory and injunctive relief;

G.      Awarding Plaintiffs and the other Class members restitution and disgorgement;

H.      Awarding Plaintiffs and the other Class members exemplary damages, should the finder of fact determine that Ford acted with malice or oppression;

I.      Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

J.      Awarding Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses; and

K.      Granting such other relief as the Court deems just and appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated: September 9, 2021                    Respectfully submitted,

*/s/* David Pastor
DAVID PASTOR (BBO# 391000)
Email:  dpastor@pastorlawoffice.com
**PASTOR LAW OFFICE LLP**
63 Atlantic Avenue, 3d Floor
Boston, Massachusetts 02110
617.742.9700 (*telephone*)
617.742.9701 (*facsimile*)

BEN BARNOW*
Email:  b.barnow@barnowlaw.com
ANTHONY L. PARKHILL*
Email:  aparkhill@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 W. Randolph Street, Suite 1630
Chicago, Illinois 60606
312.621.2000 (*telephone*)
312.641.5504 (*facsimile*)

ROBERT R. AHDOOT*
Email:  rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

ANDREW W. FERICH*
Email:  aferich@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

*pro hac vice* application to be filed

*Attorneys for Plaintiffs and the Putative Class*